UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DONALD FOSTER CORLEY,

     Plaintiff,                    Civil Action No. 16-02760

v.                               HON. WILLIAM L. CAMPBELL, JR.
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Donald Foster Corley ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income under the Social Security Act.  On February 20, 2017, Plaintiff filed a Motion for Judgment [Docket #17].   On January 30, 2018, the case was assigned to the undersigned pursuant to 28 U.S.C. § 636 for Report and Recommendation. For the reasons set forth below, I recommend that Plaintiff's Motion  [Docket #17] be GRANTED to the extent that the case be REMANDED to the administrative level for further proceedings.

# I.  PROCEDURAL HISTORY

Plaintiff filed an application for  Supplemental Security Income ("SSI") on February 26, 2013,  alleging disability as of July 3, 2006 (Tr. 189).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on July 16, 2015 (Tr. 30).  Administrative Law Judge ("ALJ") Elizabeth P. Neuhoff presided.  Plaintiff, represented by attorney Carl Groves, Jr., testified (Tr. 36-58), as did Vocational Expert ("VE") Rebecca Williams (Tr. 58-64).  On September 4, 2015, ALJ Neuhoff found that Plaintiff was not disabled (Tr. 12-25).  On August 31, 2016,  the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on October 20, 2016.

# II. BACKGROUND FACTS

Plaintiff, born April 13, 1962, was 53 when ALJ Neuhoff issued her decision  (Tr. 25, 189).  He completed ninth grade and worked previously as a machine operator (Tr. 210).  His application for benefits alleges disability resulting from depression, left eye blindness, and Hepatitis B and C (Tr. 209).

## A.    Plaintiff's Testimony

*The ALJ noted that the amended onset of disability ("AOD") was January 29, 2013* (Tr. 37).

 Plaintiff then offered the following testimony:

He had not worked since 2005 or 2006 (Tr. 38).  In his most recent job, he worked as a machine operator, requiring him to lift 50 pounds "all the time" and stand on his feet for

most of the workday (Tr. 38-39).  He was precluded from using motorized vehicles due to his vision problems (Tr. 39).  He stopped working after breaking four toes and sustaining a hairline fracture of his leg bone in a workplace accident (Tr. 40-41).  He had been offered accommodated work by his employer, but experienced difficulty keeping up with the modified position (Tr. 42).

Plaintiff stood 5' 10" and weighed 161 pounds (Tr. 42).  He was right-handed and lived with his wife of 18 years (Tr. 43).  He declined to drive due to medication side effects (Tr. 43).  He visited his aunt regularly prior to her death the previous year but was unable to offer her any assistance due to physical limitations (Tr. 44).  He was unable to sit through an hour-long church service (Tr. 44).  He used to fish but now did not have any hobbies (Tr. 45).  He spent his day staying indoors and watching shows on broadcast television (Tr. 45).  He did not use a computer and did not have a Facebook page (Tr. 45).  He had cut back but had not quit smoking (Tr. 45-46).

Plaintiff was unable to work due to "deteriorating bone disease" but was unable to obtain treatment due to financial limitation (Tr. 46-47).  He saw a psychological counselor every two weeks and a psychiatrist every three months (Tr. 47).  He took anti-psychotic medication (Tr. 48).  He experienced the occasional medication side effects of auditory hallucinations (Tr. 48).  He left school after eighth grade and was was able to read and write simple words (Tr. 48-49).  His wife took care of the household finances (Tr. 50).  Their income was limited to his wife's disability income, and he had not received unemployment

benefits or Workers' Compensation (Tr. 51).  Plaintiff's food preparation was limited to microwaving prepared food (Tr. 51).  His wife took care of the housework and laundry chores (Tr. 51).

In response to questioning by his attorney, Plaintiff reiterated that he heard voices, adding that he began hearing voices after receiving an increased dosage of Seroquel (Tr. 53). He experienced problems focusing (Tr. 53).  He denied marijuana use for the past 10 years and alcohol use for the past 20 (Tr. 54).  He was currently prescribed Morphine, adding that he was able to afford the medication due to a "Script Express card" at the local pharmacy (Tr. 55).    Morphine caused the side effects of dizziness and blurred vision (Tr. 55).    He experienced level "eight" pain on a scale of one to ten (Tr. 56).   He had been prescribed a cane in 2005 and continued to use it due to back and leg pain (Tr. 57).  Due to foot cramps, he was unable to walk for more than 10 minutes at a stretch (Tr. 57).

B.    Medical Evidence[1]

### 1. Records Related to Plaintiff's Treatment

On September 26, 2012, case manager/counselor  Mark Blaylock listed going fishing once a month and caring for Plaintiff's grandchildren as "objectives" in pursuant of improved mental health (Tr. 558).  October, 2012 records by Larry L. Turner, M.D. show that Plaintiff received a refill of Morphine (Tr. 491).  Dr. Turner noted Plaintiff's report of "throbbing"

---

[1]Records significantly predating January 29, 2013 (the beginning of the period under consideration) have been reviewed but omitted from the present discussion.

lower back pain (Tr. 510). Plaintiff reported good results from medication (Tr. 510). A physical examination was wholly unremarkable (Tr. 512). He exhibited an appropriate mood and affect (Tr. 512). Mental health goals for November, 2012 included qualifying for disability, managing physical health problems, and managing anxiety and thought disorders (Tr. 565, 567). Plaintiff reported depression due to a recent denial of disability benefits (Tr. 566). Plaintiff canceled a psychological counseling session at the end of the following month because he and his wife had to babysit four of their six grandchildren (Tr. 576).

January, 2013 records note prescriptions for Oxycodone, Xanax, Celexa, Morphine, and Seroquel (Tr. 492, 496). Notes from the same month note diagnoses of Hepatitis, low back pain, osteoarthritis, anxiety, depression, chronic pain syndrome, and degeneration of "thoracic or lumbar intervertebral disc; lumbar or lumbosacral intervertebral disc" (Tr. 496-497). A physical examination was unremarkable (Tr. 515). Notes from later the same month state that Plaintiff reported daily depression (Tr. 580). Mr. Blaylock noted that when he arrived for a home visit the same month, Plaintiff was fixing his car in the rain but "had to quit due to back and leg pain as well as fear of catching pneumonia" (Tr 583). Mr. Blaylock's notes from the appointment state that he brought Plaintiff "some food supplies . . . (potatoes) to make his food stamps stretch a little further [for the] month" (Tr. 585). February, 2013 counseling notes state that Plaintiff was forced to forego medical treatment so that he could fix his car (Tr. 585). Counseling notes from the next month state that Plaintiff experienced transportation limitations due to the inability to afford gas (Tr. 594).

He reported that he had been so "depressed, worried, and sick" that he had not been able to "get out of bed" (Tr. 594). The same month, he missed an appointment due to visiting a sister who was dying of cancer (Tr. 605, 607). April, 2013 records state that he had missed several sessions because he had been "helping to take care of" his aunt who was dying of cancer (Tr. 597).

The same month (January 2013), Dr. Turner re-prescribed pain medication (Tr. 616). A physical examination was once again unremarkable (Tr. 617-618). A July, 2013 physical examination by Dr. Turner was unremarkable (Tr. 622-623). August, 2013 mental health treatments note an abnormal mood and affect (Tr. 640). Plaintiff's condition was deemed stable (Tr. 641). He was assigned a GAF of 55 due to a combination of psychological, physical, and economic problems (Tr. 642). An October, 2013 physical examination was unremarkable (Tr. 645).

Dr. Turner's January, 2014 treatment notes are essentially identically to his earlier records (Tr. 647-649). A January, 29, 2014 pill count showed under-use of Morphine and overuse of Oxycondone (Tr. 651). Psychiatric records from April, 2014 note Plaintiff's statement that he was "doing o.k." (Tr. 807). April, 2014 medical records note spine tenderness and a decreased range of motion (Tr. 681). Counseling records note the death of three individuals (friends and family) in one week (Tr. 770). Plaintiff reported that he had "no money to put gas in his car" (Tr. 708). Blaylock noted that Plaintiff continued "to struggle with his behavioral goals due to his constant state of confusion and poor memory"

(Tr. 714).  In July, 2014 Dr. Turner made identical findings to those made in April, 2014 (Tr. 684-685).  The same month, Plaintiff reported that he obtained help to pay the rent and get caught up on the utility bills (Tr. 729).  September, 2014 counseling records state that Plaintiff attempted to mow grass but "was not able to stay on his feet because his legs gave out on him" and he was unable to finish (Tr. 741).  In October, 2014, Plaintiff reported that his back pain was becoming worse (Tr. 687).  November, 2014 counseling records note an improvement in Plaintiff's psychological condition but no progress in his physical condition (Tr. 752).  Blaylock's notes from December, 2014 state that Plaintiff had problems managing his pain due to "no health care insurance and no income" (Tr. 789).  In January, 2015, Plaintiff denied significant medication side effects (Tr. 691).  The same month, psychiatrist Michael D. Hill, M.D. noted that Wellbutrin caused the side effect of dizziness (Tr. 825). He described Plaintiff's psychiatric conditions as neither improving nor worsening (Tr. 822). In March, 2015, Plaintiff was discharged from care by Blaylock because his goals were "partially met" (Tr. 798, 857).  Plaintiff reported depression due to cancer diagnosis received by both a brother and sister (Tr. 798).  Counseling records from the following month state that Plaintiff had "not met" his goal of going fishing once a month (Tr. 854).  May, 2015 counseling records state that Plaintiff had "not been able to work on social support goals due to poor health, no money, and depression" (Tr. 843, 852).  Records from later the same month state that Plaintiff had "not had any x-rays or medical attention on his back since 2000 due to no medical insurance" (Tr. 846).

## 2. Non-Treating Records

In April, 2013, Thomas Neilson, Psy.D. performed a non-examining psychological evaluation on behalf of the SSA, finding that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and in concentration, persistence, or pace (Tr. 101-102). In May, 2013, Roy Johnson, M.D. reviewed Plaintiff's medical history on behalf of the SSA, noting that Plaintiff's depression was precipitated by the 2002 death of his daughter (Tr. 612). Plaintiff reported a prosthetic left eye, right knee pain due to an old injury, the use of a knee brace, and the need for a cane (Tr. 612). He also reported radiating lower back pain due to degenerative disc disease (Tr. 612). Dr. Johnson noted that Plaintiff was able to get on and off the examination table without assistance but walked with a limp and was unable to recover from a squat (Tr. 613-614). Dr. Johnson observed lumbar spine range of motion limitations (Tr. 614). He concluded that Plaintiff was limited to lifting 10 pounds occasionally and was unable to stand or walk for more than one to two hours in an eight-hour shift (Tr. 614).

In June, 2013, Nathaniel Briggs, M.D. completed a non-examining assessment of Plaintiff's physical limitations on behalf of the SSA, finding that while Plaintiff experienced a prosthetic left eye, he did not experience any vision limitations (Tr. 105). He found that Plaintiff was capable of lifting 50 pounds on an occasional basis and 25 pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; and could push or pull without limitation (Tr. 104). He found that Plaintiff was limited to frequent postural activity

(Tr. 104-105).  In February, 2014, P. Jeffrey Wright, Ph.D. performed a non-examining

psychological assessment, finding that Plaintiff experienced moderate limitation in activities

of daily living, social functioning, and in concentration, persistence, or pace (Tr. 125-126).

The following month, Thomas Thrush, M.D. made findings identical to Dr. Briggs' June,

2013 findings (Tr. 128-129).

### C.  Vocational Expert

VE Rebecca Williams  classified Plaintiff's past relevant work as a slitting machine

operator as semiskilled and exertionally medium and slitting machine operator helper,

unskilled/heavy[2] (Tr. 58).  The ALJ then described a hypothetical individual of Plaintiff's

age, education, and work background:

> This . . . hypothetical person can lift or carry 20 pounds on occasion, 10
> pounds frequently.  This person can sit, stand or walk at least eight hours per
> day total each with occasional pushing or pulling.  This person can perform
> postural activities on an occasional basis with no use of ladders.  This person
> can occasionally reach overhead with the left upper extremity.  This person can
> frequently handle with the left upper extremity.  This person is limited to jobs
> requiring monocular, vision only.  This person should avoid concentrated
> exposure to extremes of temperature, vibrations and hazards in the workplace.
> In addition, this person is able to understand and remember simple tasks and
> instructions and job duties should be object focused and non-public in nature.

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.

Finally, this person is able to handle gradual and infrequent changes in the workplace (Tr. 59).

The VE testified that the above limitations would preclude Plaintiff's past relevant work but would allow for the exertionally light, unskilled work of a cleaner (260,000 positions in the national economy); price marker (318,000); and label coder (26,000) (Tr. 60). She stated that her findings were based on the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 60).

The VE testified that if the same individual could perform frequent postural activities with "no climbing of ladders, ropes, or scaffolding;" was able to "understand and remember both simple and detailed one to three-step tasks;" could not "make independent decisions at an executive level;" could "sustain concentration and persistence" for such tasks; could "interact with the public, supervisors and coworkers on a superficial basis for those types of tasks but would relate better to things rather than to people;" and was "able to adapt to infrequent change," the job findings would remain unchanged (Tr. 61). The VE testified further that the same individual would be restricted to sedentary work if he were limited to lifting or carrying five to ten pounds on an occasional basis and standing or walking two hours a day (Tr. 62). In response to questioning by Plaintiff's attorney, the VE testified that the need to use a cane would preclude the light jobs of cleaner, price marker, and label coder (Tr. 63).

### D. The ALJ's Decision

Citing the medical transcript, ALJ Neuhoff found that while Plaintiff experienced the severe impairments of "left eye blindness, non-displaced left foot fracture, degenerative joint disease, hepatitis B and C, depression and anxiety," none the impairments met or medically equaled an impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15). ALJ Neuhoff found that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 16). She found that the condition of "low back pain" was a non-severe impairment (Tr. 15). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work:

> [H]e can lift and carry 20 pounds on occasion and 10 pounds frequently. He is able to sit, stand, or walk for six hours total each in an eight-hour workday. He can occasionally push or pull with the bilateral upper and lower extremities. He can frequently perform all postural activities. In addition he can understand and remember both simple and detailed one to three step tasks but cannot make independent decisions at an executive level. He is able to sustain concentration and persistence for those tasks with customary breaks. He is able to interact with the public, supervisors, and co-workers on a superficial basis for those tasks but would relate better to things rather than to people. He is able to adapt to infrequent change. He can perform no work that requires excellent binocular vision (Tr. 17).

The ALJ found that due to "new and material" evidence, the RFC contained in an earlier non-disability determination was "no longer appropriate" (Tr. 17-18)(citing Drummond v. CSS, 126 F.3d 837 (6th Cir. 1997)). Citing the VE's testimony, the ALJ found that Plaintiff was unable to perform his past relevant work but could perform the light, unskilled work of a cleaner, price marker, and label coder (Tr. 24, 60).

The ALJ discounted Plaintiff's allegations of limitation. She stated that Plaintiff's allegations of limitations in sitting were undermined by his ability to sit for at least 40 minutes at the hearing (Tr. 19). She observed that although Plaintiff brought a cane to the hearing, he testified that he could walk without it and was observed "many, many, times . . . without a cane" (Tr. 19). She cited treating records for the relevant period showing a normal gait (Tr. 19).

The ALJ referred to other "discrepancies" between Plaintiff's testimony and the medical evidence (Tr. 20). She cited treating records noting Plaintiff's denial of cognitively-related medication side effects (Tr. 20). She remarked that Plaintiff and his disabled wife were able to babysit for four of his grandchildren (Tr. 20). She cited his case manager's report that during a home visit, Plaintiff was observed "work[ing] on his car in the rain" (Tr. 20). She cited April, 2014 treating records stating that he was in no distress and did not experience joint or limb tenderness in the lower extremities (Tr. 20).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.    ANALYSIS

Plaintiff makes two main arguments in favor of remand.  First, he disputes the finding that his lower back pain and chronic pain syndrome were not a severe impairments. *Plaintiff's Brief,* 4-14, *Docket #18,* Pg ID 924.  He acknowledges that the transcript does not contain imaging studies to support the allegations of back problems, but contends that the absence of studies was attributable to his financial limitations rather than the lack of symptomology.  *Id.*  He argues that the ALJ failed in "her absolute obligation to assist" him in making his claim for benefits by ordering imaging studies or additional examinations.  *Id* at 11-12.  Plaintiff also notes that the diagnosis of chronic pain syndrome by Dr. Turner (Tr. 834) could not be ascertained through imaging studies.  *Id.*  at 9-10.  Finally, faults the ALJ citing his ability to sit for the 40-minute hearing as evidence of non-disability.  *Id.* at 12-14.

In his second argument, Plaintiff argues that the ALJ erred by rejecting Dr. Johnson's consultative finding that he was limited to exertionally sedentary work.  *Id.* at 15-21.  He faults the ALJ for citing Dr. Johnson's observation that he could climb on and off the examine table without assistance while discounting the consultative examiner's ultimate finding that he was limited to sedentary work.[3]

---

[3]

A finding that Plaintiff, 53 at the time of determination, was limited to sedentary work

## A. The Step Two Determination

### 1. The Treating and Consultative Records

At the second step of the sequential analysis, the ALJ found that the condition of "low back pain" did not rise to the level of a severe impairment (Tr. 15). She acknowledged Dr. Turner's diagnosis of "degeneration of thoracic or lumbar intervertebral disc" or "lumbar or lumbosacral intervertebral disc" (Tr. 15). However, in finding that the condition of low back pain was non-severe, she reasoned as follows:

> While the claimant has received medical treatment for low back pain the record contains no medical imaging of the claimant's back, nerve conduction studies, or supporting diagnoses. At the consultative examinations, straight leg raises were negative and there were no noted motor deficits . . . . The consultative examiner found some reduction in range of motion but he also found a negative straight leg test. Therefore, without additional supporting objective evidence such as imaging, the claimant's low back pain is a non-severe impairment (Tr. 15).

The ALJ did not address Dr. Turner's diagnosis of chronic pain syndrome.

At Step Two, an "impairment or combination of impairments ... [is] found 'not severe' and a finding of 'not disabled' is made ... when medical evidence establishes only a slight abnormality or [ ] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, *3 (1985).

---

would direct a finding of disability. Under Medical–Vocational Rule 201.09, an individual closely approaching advanced age with Plaintiff's limited education, no transferrable skills, and a limitation to sedentary work generally directs a finding of disability. 20 C.F.R. part 404, subpart P, App. 2. "Individuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." *Id.*

"In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.' " *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. February 22, 2008)(*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998)). "The goal of the test is to 'screen out totally groundless claims.' " *Id.* (*citing Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985)). 20 C.F.R. § 404.1522(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." *See also* SSR 85-28, *supra*, at *3. "Basic work activities" include "walking, standing, sitting" as well as the capacity for "seeing, hearing, and speaking;" and the psychological ability to carry out unskilled work. *Id.*

The ALJ's finding that low back pain was a non-severe impairment is problematic for multiple reasons. First, the evidence before the ALJ strongly supports the conclusion that the lower back pain caused more than minimal limitation. The ALJ acknowledged Dr. Turner's diagnosis of degenerative disc disease[4] (Tr. 15, 680). Treating records by Dr. Turner repeatedly note "throbbing" back pain and range of motion limitations (Tr. 510, 496, 515, 647, 681, 684-685). While Dr. Turner's observations do not vary much between September, 2012 and July, 2014, (1) the records indicate that Plaintiff demonstrated some degree of physical limitation resulting from the back problems, and (2) Dr. Turner found that Plaintiff's condition required the long-term use of opiate medication. *Id.* Dr. Johnson's consultative examination likewise showed a reduced range of lumbar spine motion (Tr. 613-614). Despite the lack of imaging studies, both the treating and examining source findings

---

[4]Defendant contends that the inclusion of "degenerative joint disease" among the severe impairments sufficiently addresses limitations caused by the back condition. *Defendant's Brief* at 5, *Docket #20*, Pg ID 955. However, the ALJ went on to state that pain caused by the back condition did not cause more than minimal limitations. As such, the finding that degenerative joint disease was a severe impairment does not cure the omission of back pain from the Step Two impairments. It is worth noting that Dr. Turner's diagnosis of chronic pain syndrome (Tr. 680) was also not included at Step Two.

overwhelmingly support the conclusion that Plaintiff experienced some *significant* degree of physical limitation due to back problems.

I am mindful that the omission of a condition from the Step Two impairments by itself does not warrant remand. So long as "an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two 'does not constitute reversible error.' " *Fisk v. CSS*, 253 Fed.Appx. 580, 583, 2007 WL 3325869, *4 (6th Cir.November 9, 2007)(citing *Maziarz v.HHS*, 837 F.2d 240, 244 (6th Cir. 1987)). Here, however, the remaining analysis does not address the limitations brought on by the back condition. The RFC for light work with "frequent" postural activity (including crouching for up to two-thirds of the workday) stands directly at odds with Dr. Johnson's observation that Plaintiff was unable to recover from a single squat (Tr. 613-614).[5]

### 2. Plaintiff's Allegations of Limitation

The ALJ's flawed rationale for rejecting Plaintiff's allegations of disabling back pain also undermines the Step Two determination. The ALJ remarked that "many discrepancies came to light when [Plaintiff] testified" (Tr. 20). However, the credibility determination is based largely on the ALJ's mis-characterizations and erroneous citations to the record.

First, the ALJ discounted Plaintiff's testimony that he had not been fishing in over 10

---

[5]

The ALJ accorded "great weight" to non-examining source Dr. Thrush's finding that Plaintiff could perform frequent postural activities, despite Dr. Johnson's observation that Plaintiff could not recover from a squat (Tr. 22). Dr. Thrush also concluded that Plaintiff could perform exertionally medium work and did not have visual limitations (128-129). The "no visual limitation" finding is defeated by the fact that Plaintiff has a left eye prosthesis. The medium work finding is wholly unsupported by any of the treating or consultative evidence or the daily activities. Although the ALJ declined to adopt Dr. Thrush's finding of no visual limitations and the medium work finding, the unsupported findings cast doubt on the remainder of the Dr. Thrush's assessment.

years, noting that the psychological counseling records state that he went fishing once a month (Tr. 16, 45). However, the ALJ clearly misread the treating records which state that "fishing once a month" was identified as "objective" to overcome Plaintiff's "problem" of no "leisure activities or hobbies" (Tr. 558). Although fishing once a month is listed repeatedly among Plaintiff's "objectives" in the subsequent treating records (Tr. 563, 565, 567, 570, 572, 854), not one of the records state that he *actually* went fishing even once during the relevant period, and "fishing" is actually referred to as an objective *not* met at least twice in the treating notes (Tr. 795, 854).

Next, the ALJ questioned Plaintiff's claim that his wife "did all the chores" given that she was collecting disability income (Tr. 20). However, the record is silent as to the extent of the wife's actual physical limitations or whether she was incapable of performing household chores. The record includes a January, 2015 statement that she took Wellbutrin, a psychotropic medication, suggesting that her disability was attributable to a combination of physical and psychological conditions (Tr. 824).

The ALJ also discounted Plaintiff's allegations citing treating records stating that he missed appointments because he was "helping a sick relative" (Tr. 20, 22). While the transcript pages cited by the ALJ state that he missed counseling sessions because he was "taking care of" two sick relatives, the Plaintiff later testified that he did not provide household or personal "care-giving" services to anyone, noting that while he visited his ailing aunt and sister, he was unable to offer any assistance due to his own physical limitations (Tr. 44). Likewise, while the ALJ supported her credibility determination by noting that Plaintiff and his wife babysat for their grandchildren, the record shows that they babysat *once* on New Year's Eve (Tr. 576). None of the other records indicate that Plaintiff provided any childcare services (Tr. 20).

In further support of the credibility determination, the ALJ noted that in January, 2013, Mr. Blaylock arrived at Plaintiff's home "and found [Plaintiff] was working on his car in the rain" (Tr. 20). The ALJ's summation suggests that (1) Plaintiff possessed the energy

and wherewithal to fix his car and, (2) he was able to work outdoors in inclement weather. However, the ALJ's finding is drawn from Blaylock's records from January, 2013 and early February, 2013, which read in their entirety cast a different light on the activity: Mr. Blaylock's  January, 2013 notes state that upon pulling up to Plaintiff's residence, he

> "found [Plaintiff] attempting to take bolts off his car's water pump in the cold rain but [Plaintiff] had to quit due to back and leg pain as well as fear of catching pneumonia. [Plaintiff] states he has been struggling to make progress on his behavioral goal because he has been worried about missing his wife's medical appointments too because the car is broke down" (Tr. 583).

Blaylock's  notes from the following month indicate that he found Plaintiff's report of financial strain credible:

> [Plaintiff] reports he does not have money to fix the water pump on his car and he has to get that going before he can spend money he doesn't have on his back, leg, neck, and rib cage pain . . . . [Blaylock] brought [Plaintiff] some food supplies today (potatoes) to make his food stamps stretch a little further this month" (Tr. 585).

A fair reading of these records indicates that (1) Plaintiff could not afford to have his car fixed and unsuccessfully attempted the repair himself despite his physical limitations, (2) he did not have the money for both car repairs and medical treatment, (3) he was unable to stand for extended periods and, (4) Plaintiff's long-term counselor perceived that Plaintiff experienced difficulty affording food, much less medical insurance (Tr. 585-583).  The ALJ's conclusion that Plaintiff's ability to "stand in the rain" and attempt to fix his broken car supports the a non-disability finding amounts to a distortion of these records.  Aside from this, Plaintiff's ability to work on his car for a short period does equate with the ability to perform full-time work.   It is well settled that activities performed on an intermittent basis do not establish disability.  *See Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967)(claimant's ability to perform certain tasks "slowly and with difficulty" improperly cited to support the non-disability determination).  Likewise,  Plaintiff's ability to sit through

the 40-minute hearing without a break on one occasion does not support the contention that he could stand or walk for six hours in an eight-hour workday (Tr. 19).

The ALJ's failure to acknowledge that Plaintiff's ability to access treatment was stymied by financial limitations also taints the Step Two findings. The ALJ's finding that the lack of imaging studies and sparse treatment records were "relatively weak" (Tr. 16) are not intrinsically improper. However, aside from one passing reference to Plaintiff's report that he and his wife subsisted on his wife's disability income and that Plaintiff borrowed money to pay for medicine, the ALJ erred by failing to acknowledge that his financial problems compromised his medical care. (Tr. 19), An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain the failure to seek medical treatment." SSR 96–7p, 1996 WL 374186, *7 (July 2, 1996); *See also* SSR 82–59, 1982 WL 31384, *4 (1982)(The ALJ must consider an individual's claim that she is unable to afford the prescribed treatment).

By any fair reading, the transcript shows that the Plaintiff and his wife experienced severe financial and personal strain during the relevant period. Mr. Blaylock noted that Plaintiff was required to choose between procuring treatment for his own physical conditions and fixing the car used to take his wife to doctor's appointments (Tr. 585). Blaylock brought potatoes to Plaintiff after perceiving that food stamps would not last Plaintiff until the end of the month (Tr. 585). March, 2013 records state that Plaintiff had "no money to put gas in his car" (Tr. 594). April, 2014 records also state that Plaintiff could not afford gas money (Tr. 708). July, 2014 records state that Plaintiff was behind in his utility bills and experienced problems paying the rent (Tr. 729). Mr. Blaylock's December, 2014 notes state that Plaintiff had pain management problems due to "no health care insurance and no income" (Tr. 789). May, 2015 records state likewise that Plaintiff experienced "poor health, no money, and depression" (Tr. 843, 852). Other records from the same month state that

Plaintiff had not had imaging studies or significant "medical attention" for back problems since 2000 due to the lack of medical insurance (Tr. 846). While the record contains numerous references to Plaintiff's inability to procure appropriate treatment, the ALJ did not cite any of them. Notably, none of the treating or consultative records by Blaylock or Drs. Turner or Johnson suggests that Plaintiff exaggerated his physical problems or was malingering.

In summary, the medical evidence supports the finding that the back condition created more than minimal work-related limitations. The Step Two finding is further undermined by the poorly supported rejection of subjective claims and the failure to acknowledge that Plaintiff's financial limitations prevented him from obtaining additional treatment. As such, a remand is warranted.

### B. Dr. Johnson's Findings

Plaintiff also disputes the ALJ's rejection of Dr. Johnson's finding that he was limited to sedentary work. *Plaintiff's Brief* at 17-23.

As discussed above, Dr. Johnson examined Plaintiff in May, 2013, noting Plaintiff's report of radiating lower back pain due to degenerative disc disease (Tr. 612). Dr. Johnson noted that Plaintiff was able to get on and off the examination table without assistance but walked with a limp and was unable to recover from a squat (Tr. 613-614). Dr. Johnson observed a limited range of lumbar spine motion (Tr. 614). He concluded that Plaintiff was limited to lifting 10 pounds occasionally and was unable to stand of walk for more than one to two hours in an eight-hour shift (Tr. 614).

The ALJ accorded "little weight" to Dr. Johnson's sedentary work conclusion, noting that it appeared "to be based primarily on [Plaintiff's] subjective complaints" (Tr. 22). She cited Dr. Johnson's finding of a full range of motion in the elbow, wrists, and ankles (Tr. 22). She noted that Plaintiff was able to get on and off the examining table without problems (Tr. 22). She noted that Dr. Turner's treating records from the month before noted "no joint or limb tenderness" on palpation (Tr. 22 *citing* 617).

Because Dr. Johnson was a one-time examining rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(*citing Atterberry v. HHS*, 871 F.2d 567, 572 (6th Cir. 1989)). *See also DeLong v. CSS,* 748 F.3d 723, 726 (6th Cir. 2014)(*citing Ulman v. CSS,* 693 F.3d 709, 713 (6th Cir. 2012))(substantial evidence standard does not permit the court to resolve conflicts in evidence, rather the district court must affirm an ALJ as long as it is supported by substantial evidence and made pursuant to proper legal standards). Where a treating source opinion is not controlling, the consultative opinions are evaluated based on "specialization, consistency, and supportability . . . ." *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013); 416.927(c)(2).

The ALJ appears to have provided a facially adequate discussion of Dr. Johnson's findings, including his status as a consultative source and discrepancies between the treating record and the consultative findings. Whether or not the ALJ's rejection of the Dr. Johnson's opinion, standing alone, constitutes grounds for remand, when it is considered in tandem with

the errors discussed in Section A., *above*, the rationale for rejecting his opinion strengthens the case for further proceedings. First, the ALJ summation of Dr. Johnson's findings reflects at best a highly selective account of the record. She noted that Plaintiff had full range of motion in the elbows, wrists, and ankles, but did not acknowledge the lumbar and neck range of motion studies showing significant limitations (Tr. 613-614). Her observation that Plaintiff did not experience elbow or wrist problems is somewhat beside the point, given that he did not allege limitations in those areas. While the ALJ concluded that Dr. Johnson's findings were based mostly on the "subjective complaints," she failed to note Dr. Johnson's observation that Plaintiff was unable to recover from even one squat (Tr. 613-614).

While the ALJ was not required to discuss every one of Dr. Johnson's discrete findings, the omission of reference to the squatting limitations is of concern given that she rejected the consultative findings in favor of Dr. Thrush's non-examining finding that Plaintiff could perform postural activity (including stooping, kneeling, and crouching) up to two-thirds of an eight-hour workday (Tr. 128). "'As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination . . . .'" *Gayheart,* 710 F.3d at 375. The ALJ's reliance on Dr. Thrush's finding is particular troubling, considering that his functional capacity assessment is identical to Dr. Brigg's non-examining assessment made nine months earlier, including Dr. Brigg's clearly erroneous finding that Plaintiff did not experience visual limitations despite the use of a left eye prosthesis (Tr. *compare* 105, 128). Moreover, the rejection of Dr.

Johnson's findings is particularly critical given that the transcript does not otherwise contain a treating/examining assessment of Plaintiff's limitations.

While the errors discussed in Section A require a remand, an award of benefits would be premature. An award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. HHS*, 17 F.3d 171, 176 (6th Cir. 1994). While Plaintiff bears the ultimate burden of establishing disability, the record strongly shows that his ability to obtain treatment was stymied by his financial limitations. Therefore, I recommend upon remand that the ALJ (1) order additional consultative testing and/or testimony by a medical expert as to Plaintiff's degree of limitation and whether the back condition(s) qualifies as a "severe" impairment and, (2) revisit the credibility determination consistent with the above findings.

## VI. CONCLUSION

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment [Docket #17] GRANTED to the extent that the case be REMANDED to the administrative level for further proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 7, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 7, 2018, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen